IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 13, 2016

STATE OF TENNESSEE v.
LAURIE LYNN WELCH and ROLAND JOHN WELCH

Appeal from the Circuit Court for Maury County
Nos. 21949, 21950   Stella L. Hargrove, Judge
_____

No. M2015-00361-CCA-R3-CD – Filed October 13, 2016
_____

Defendants, Laurie Lynn Welch ("Mrs. Welch) and Roland John Welch (Mr. Welch"), were convicted of promotion of methamphetamine manufacturing, initiation of methamphetamine manufacture process, and possession of drug paraphernalia. Mrs. Welch was sentenced to four years for the promotion charge, eight years for the initiation charge, and eleven months, twenty-nine days for possession of drug paraphernalia to be served concurrently for an effective eight-year sentence to be served in the Department of Correction as a Range I offender. Mr. Welch was sentenced to eight years for the promotion charge, eighteen years for the initiation charge, and eleven-months, twenty-nine days for possession of drug paraphernalia to be served concurrently for an effective eighteen-year sentence to be served in the Department of Correction as a Range II offender. On appeal, both Defendants argue that: (1) the affidavit in support of the search warrant did not contain probable cause; (2) the trial court erred by failing to suppress evidence discovered as a result of a warrantless search and seizure; (3) the evidence was insufficient to support both Defendants' convictions for promotion of methamphetamine manufacture and initiation of methamphetamine manufacturing process and Mr. Welch's conviction for possession of drug paraphernalia; and (4) Mr. Welch's sentence was excessive. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined. ROGER A. PAGE, J., not participating.

Lee E. Brooks, Spring Hill, Tennessee (on appeal), and Shara A. Flacy, Ardmore, Tennessee, (at trial) for the appellant, Laurie Lynn Welch.

Jacob J. Hubbell, Columbia, Tennessee, for the appellant, Roland John Welch.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Patrick Howell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Suppression Hearing*

Detective Bob Zaiden of the Maury County Sheriff's Office, Drug Unit, testified that on July 11, 2012, he received a phone call from a Walgreen's pharmacist in Columbia concerning a suspicious purchase of pseudoephedrine pills. Detective Zaiden drove to the store parking lot and observed a young man fitting the suspect's description exit the store and get into a small truck with a woman. The two were later identified as Jonathan Castille and Stephanie Hicks. Mr. Castille and Ms. Hicks next drove to a nearby Kroger store, and Ms. Hicks walked into the store. Detective Zaiden followed her inside and observed her purchase a second box of pseudoephedrine. It was Detective Zaiden's experience that those individuals who purchase pseudoephedrine for the purpose of manufacturing methamphetamine tend to purchase each box at a different store.

Detective Zaiden continued following Mr. Castille and Ms. Hicks after they left the Kroger parking lot and turned south onto Trotwood Avenue. He decided to stop the vehicle because the only other store for them to purchase pseudoephedrine would have been the Rite Aid in Mt. Pleasant. Detective Zaiden explained that any further purchase by Mr. Castille or Ms. Hicks would have been denied because of their two previous purchases in Columbia. Detective Zaiden testified that Mr. Castille and Ms. Hicks had two boxes of pseudoephedrine in their possession at the time of the stop. After they were advised of their *Miranda* rights, Mr. Castille admitted that he was buying the pseudoephedrine to sell to someone named "Glenn," (later identified as Joseph Glenn Glover) and Ms. Hicks indicated that they would receive fifty dollars per box from "Glenn." Mr. Castille and Ms. Hicks also stated that the pseudoephedrine would be used to manufacture methamphetamine. Detective Zaiden testified that the information provided by Mr. Castille and Ms. Hicks was consistent with Detective Zaiden's experience with "smurfs," who purchase the ingredients for methamphetamine manufacturers known as "cooks." He further explained that the legal limitations on the amount of pseudoephedrine that may be purchased during a certain period of time prevented "cooks" from buying the quantities of pseudoephedrine that they needed to manufacture methamphetamine. Therefore, the "cooks" contracted with the "smurfs" to obtain the necessary ingredients.

Detective Zaiden advised Mr. Castille and Ms. Hicks that they had committed the crime of promoting the manufacture of methamphetamine. The two gave a written

2

statement and agreed to make a controlled delivery of the pseudoephedrine to "Glenn." Detective Zaiden followed Mr. Castille and Ms. Hicks to a predetermined location where Mr. Castille and Ms. Hicks and their vehicle were searched.  A recorded call was placed to Mr. Glover, and Mr. Castille and Ms. Hicks indicated to him that their vehicle had broken down on Highway 43 and that Mr. Glover would have to meet them there to pick up the pseudoephedrine.  Officers observed the area on Highway 43 and used listening devices for the transaction.  Approximately twenty to thirty minutes later, a white Dodge Dakota truck driven by Mr. Glover arrived at the scene on Highway 43.  Mr. Glover's wife, Karen Glover, was also in the vehicle.  Mr. Glover walked up to the passenger side of Mr. Castille's and Ms. Hick's vehicle and received the two boxes of pseudoephedrine from them.  Mr. Glover promised to pay them the following day.

Detective Zaiden testified that Mr. Glover drove away, and Detective Zaiden and other officers began following him.  Mr. Glover was eventually stopped on Enterprise Drive in Mt. Pleasant.  Detective Zaiden advised Mr. and Mrs. Glover that they had participated in a controlled buy of pseudoephedrine pills.  Mr. Glover was initially uncooperative but Mrs. Glover was cooperative.  Both of them eventually agreed to make a controlled delivery of the two boxes of pills to Defendants, Roland John Welch and Laurie Welch.  Detective Zaiden met Mr. and Mrs. Glover at a predetermined location where they were searched along with their vehicle.  Mr. Glover placed a call to Defendants but no one answered, so a text was sent to Defendants.  Contact was later made with Mrs. Welch, and Mr. Glover told her, "Well, I have those two things for you," and Mrs. Welch replied, "Yeah, come on.  Come on over."  Detective Zaiden testified that the "two things" referred to the two boxes of pseudoephedrine.  The call was recorded and played to the jury.  Detective Zaiden testified that before the delivery, the Lawrence County Sheriff's Drug Unit arrived to assist with the transaction because they were familiar with Mr. Welch, and they provided background information on him.  Detective Zaiden, Detective Stanfield, and Mr. Glover then drove by Defendants' residence on South Old Highway 43 in Detective Stanfield's car in order for Mr. Glover to point the house out to them, and they drove back to the predetermined location.  Two detectives then drove to the area to observe any traffic going in or out of Defendants' house.

At approximately 11:00 p.m., Mr. Glover alone drove back to Defendants' house to deliver the two boxes of pseudoephedrine.  Officers followed Mr. Glover to the house and watched him walk inside.  Mr. Glover remained inside the residence for approximately thirty-three minutes, as stipulated by the parties at trial.  Mr. Glover was observed exiting Defendants' house, and he drove back to the predetermined location to be searched.  Detective Zaiden testified that Mr. Glover informed him that he was going to be paid for the pseudoephedrine with methamphetamine and that Defendants were going to manufacture methamphetamine.  Detective Zaiden testified:

3

Well, at that time, then that's when I advised the other members that we needed to make contact with the occupants before they used the pills that we delivered and start the initiation the process of - - to manufacture methamphetamine with those pills.

Detective Zaiden further testified that there are inherent dangers in the manufacture of methamphetamine because hazardous materials are used that can be "very toxic" and "it can be very dangerous to a person that's untrained or around these toxic chemicals, and these active ingredients would - - could cause some serious injuries; which we've had some officers injured in the past because of these hazardous materials."

Detective Zaiden did not know how the officers got into Defendants' residence but when Detective Zaiden arrived, he was advised by Detective Rob Wagonschutz that there were two occupants in the residence and that there was an active methamphetamine ("meth") lab in the house. Everyone was taken outside on the porch, and Detective Zaiden advised Defendants that he was going to obtain a search warrant for their residence. He thought that it took "maybe close to two hours" to get the search warrant. Detective Zaiden testified that it generally takes an hour to make a batch of methamphetamine.

After obtaining the search warrant, Detective Zaiden drove back to Defendants' residence and advised them of their *Miranda* rights. He also gave Defendants a copy of the search warrant. Mr. Welch made the following statement, "It is what it is." Mrs. Welch told Detective Zaiden that she smoked marijuana but did not "mess" with methamphetamine. Detective Zaiden testified that during the search, "an active cook bottle" used to make methamphetamine was found in the house. He said that the methamphetamine in the bottle was in the "finished stages of it." Detective Zaiden testified that the bottle contained eight to ten ounces of what appeared to be "meth oil." He sent a sample of the substance in the bottle to the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis. The two boxes of pseudoephedrine delivered by Mr. Glover were found in the room where both Defendants had been located. After the search, Defendants' residence was placed under quarantine. Detective Zaiden spoke to Mrs. Welch again the following day and advised her of her *Miranda* rights. She requested an attorney, and Detective Zaiden did not ask her any further questions.

On cross-examination, Detective Zaiden testified that at the time he obtained the search warrant, he did not know if there were additional ingredients other than the two boxes of pseudoephedrine in the house that could be used to manufacture methamphetamine. Mr. Glover had told him that, "Mr. Welch was going to manufacture meth so [Mr. Glover] could get paid with it."

4

Detective Zaiden testified that officers entered Defendants' home before the search warrant had been issued because of a threat to the officers and the potential destruction of evidence. When asked if there were any other reasons why officers entered the residence without a warrant, Detective Zaiden testified: "Well, we didn't want them to initiate the process to manufacture methamphetamine with the precursors that we just delivered." He stated that it would have resulted in the destruction of evidence. Detective Zaiden noted that the Glovers "made an understanding with the Welch[]s that they deliver boxes there and they would receive methamphetamine for those boxes." Detective Zaiden admitted that there was no smell of methamphetamine coming from the residence when the officers initially entered. He said that he would have obtained a search warrant for the residence even if officers had not gone inside because of the delivery of the two boxes of pseudoephedrine by Mr. Glover.

*Trial*

Detective Zaiden's trial testimony mirrored that of his testimony at the suppression hearing of events that led to the issuance of a search warrant for Defendants' residence. Detective Zaiden testified that the Lawrence County Sheriff's Office Drug Unit assisted with securing the scene at Defendants' residence while Detective Zaiden obtained the search warrant. When asked why the residence was secured before the search warrant was obtained, Detective Zaiden testified: "Because believe it or not, when we deliver that box to them, we're actually in the process of promoting methamphetamine. So we cannot allow those boxes to be used in the manufacture process."

Detective Zaiden testified that when he arrived back at Defendants' residence with the search warrant, he advised both Defendants of their *Miranda* rights. Mr. Welch explained to Detective Zaiden that he had "told another officer that there was a cook bottle in the house." Detective Zaiden testified that a "cook bottle" is the "actual apparatus that is used to manufacture meth in the process of manufacturing meth." He further explained that the bottle is usually some type of two-liter bottle in which all of the ingredients to manufacture methamphetamine are placed inside and mixed together. It is also known as the "shake and bake" method.

Detective Zaiden testified that he functioned as the "Evidence Clerk" during the search of the residence and logged in all of the evidence that was found. In addition to the "cook bottle" containing clear liquid, officers also discovered an ammunition can which contained the following items: seven packages of plastic tubing; two packages of coffee filters; one black meth pipe; one opened instant cold pack; a one-gallon bottle of muriatic acid; a one-gallon can of lantern fuel; one gas generator bottle; two one-pound

5

bottles of lye; one small funnel; one measuring cup; one small tin can with eleven lithium batteries; five used coffee filters; and four bottle caps. Detective Zaiden explained that all of the items are commonly used in the manufacture of methamphetamine.

In addition to the items in the ammunition can, officers also found additional plastic tubing; a razor blade with residue that field-tested positive for methamphetamine; eight aluminum "boats," which are pieces of aluminum foil used to ingest methamphetamine; a case with a glass pipe; a small black electronic scale commonly used to measure methamphetamine to sell; two metal grinders with marijuana residue; a white pill bottle with burnt marijuana cigarettes; a hemostat with a burnt marijuana cigarette; a glass marijuana pipe; a plastic bag with marijuana; a package of rolling papers; a white electric blender commonly used to grind pseudoephedrine pills; three surveillance cameras; a package of AA lithium batteries; a Pentax cell phone with charger; a black electronic scale; and pipe cutters. Detective Zaiden testified that pipe cutters are commonly used to open lithium batteries. The officers also found the two marked boxes of pseudoephedrine that were delivered to the residence by Mr. Glover. The two boxes were hidden under the couch in the living room. The receipt from where Mr. Castille had originally purchased one of the boxes of pseudoephedrine was also there. The officers found a plate, scale, spoon, and two paper cards with residue in a room where the "cook bottle" was located.

All hazardous materials were removed from the house, and Detective Zaiden informed Defendants that they were each being placed under arrest. When Detective Zaiden asked Mr. Welch about the items, Mr. Welch responded: "It is what it is." Mrs. Welch told Detective Zaiden that she only smoked marijuana. When asked about methamphetamine, Mrs. Welch responded that she did not "f--k with this sh-t." Detective Zaiden testified that Mrs. Welch was allowed back inside the house to get a change of clothing. The residence was then placed under quarantine. Detective Zaiden sent a sample of the clear liquid from the "cook bottle" to the TBI Crime Lab to be analyzed, and a crystal substance was also sent to the lab.

Special Agent Laura Cole of the TBI Crime Lab, Drug Chemistry Section, testified that she tested a grey crystal substance which was determined to be Methylone, which is a synthetic drug known as a "bath salt." Special Agent Cole also tested the sample of the liquid from the "cook bottle." The first test that she performed revealed the presence of methamphetamine, and a second test confirmed that methamphetamine was present. Special Agent Cole testified that the substance was 16.90 grams. She also noted that the liquid was not a finished product.

Lieutenant Kenneth Seibold of the Spring Hill Police Department was working with the Drug Task Force on July 11, 2012. He and Detective Wagonschutz watched

Defendants' residence after Mr. Glover delivered the boxes of pseudoephedrine. After Mr. Glover left the house, Lieutenant Seibold and other officers secured the residence while Detective Zaiden went to get a search warrant. Lieutenant Seibold testified that he did not look for any evidence while in the residence and that he only secured the occupants of the house. He thought that there were approximately six officers who helped secure the house. Lieutenant Seibold testified that Detective Wagonschutz advised him that they had found a "meth lab" in the house. Lieutenant Seibold said, "So we knew at that point that we have to get people out of the house. And so the entire process took about 10 minutes, give or take a few." He further testified:

> In this particular instance, we're securing it because we know they're prepping to make methamphetamine. And what we don't want to have happen, that we've had happen in the past, is a box be delivered - - because the boxes is [sic] an essential part of methamphetamine. What we don't want to have happen is knowing that there's an active lab.
>
> I breathe the - - I had to inhale the vapors and the acid from it before and had to go to the hospital. It's not a fun experience at all.
>
> Methamphetamine is a very nasty drug. The whole process to do the meth - - methamphetamine is nasty. So to avoid that, at the earliest convenience, we secure it before that - - hopefully before that happens and wait for the search warrant.

Lieutenant Siebold testified that when he passed one of the doorways to the left inside the house, he noticed a smell that was consistent with what he had smelled from investigating other methamphetamine labs.

Lieutenant Siebold testified that it took a couple of hours for Detective Zaiden to return with the search warrant. Everyone, including Defendants, waited outside until Detective Zaiden returned. Lieutenant Siebold testified that he took photographs after the search began.

Detective Wagonschutz testified that he participated in securing Defendants' residence. He said:

> [A] secured operation is when we do a controlled delivery of pseudoephedrine. We take certain steps to make sure that it is going to be used for an illicit purpose.

7

When we secure the residence, in order to keep from violating the law, ourselves, when we deliver a box of pseudoephedrine we can't allow that person to turn Sudafed into meth, because then we will have aided in that crime.

So we sought guidance from the D.A.'s on the best way to - - to do these operations, and we were directed that upon delivery and it's been confirmed that the box was delivered, then we immediately secure the residence, detain everybody, and then apply for a search warrant to go back and search the residence for the pills and the warrant - - other items that would have been used to produce meth using those pills.

Detective Wagonschutz testified that upon entering the residence, he cleared a section of the house to make sure that there were no threats or armed individuals hiding in the house. In a room to his right, Detective Wagonschutz testified that he smelled the "odor of a meth lab somewhere in that vicinity." He found a "methamphetamine one pot cook bottle" in a trash can in the "little computer room."

Joseph Glenn Glover testified that he and Defendants are acquaintances, and he had visited their residence. On July 10, 2012, Mr. Glover said that he was driving through Mt. Pleasant when he was pulled over by police. He had received two boxes of pseudoephedrine pills from "another guy and girl." Mr. Glover testified that he planned to trade the pills to Mr. Welch in exchange for methamphetamine. He said that the officers gave him the option of either being arrested or delivering the pills to Mr. Welch. Mr. Glover agreed to deliver the pills.

Mr. Glover testified that he placed a call to Defendants' cell phone, and Mrs. Welch answered. He told Mrs. Welch, "I've got a couple of them. Are you still up?" Mr. Glover testified that when he asked Mrs. Welch if he could drop a couple of "them" off, she replied, "Good. Come on." Mr. Glover testified that he drove his white Dodge Dakota truck to Defendants' residence. He said that he walked inside the house, sat down and began talking to Defendants. Mrs. Welch was in the room the entire time sitting on the couch. Mr. Glover testified that he placed the two boxes of pseudoephedrine on a table in the room. Mr. Welch told Mr. Glover that he would see him the following day to reimburse Mr. Glover for the pills. Mr. Glover understood that to mean that he would receive methamphetamine in exchange for the pills. Mr. Glover then left the residence and met with officers who searched him. He noted that he had been given a recorder which he returned to the officers.

On cross-examination, Mr. Glover acknowledged that he had been drinking earlier in the day. He also drank some moonshine and smoked marijuana at Defendants'

residence. Mr. Glover noted that his wife had previously been in the truck with him, but she did not participate in the delivery of the boxes of pills.

*Analysis*

## I. Sufficiency of Affidavit Supporting the Search Warrant

Defendants contend that the search warrant in this case was not supported by probable cause because the information set out in the affidavit does not meet the two-prong test set out in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) ("*Aguilar–Spinelli* "), as adopted in *State v. Jacumin*, 778 S.W.2d 430, 437 (Tenn. 1989), concerning the proof of the reliability of a confidential informant. Mr. Welch further argues that the statements contained in the affidavit are fatally conclusory, do not relate to him, and do not specifically indicate illegal activity.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Furthermore, questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. "We afford to the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). However, we review a trial court's application of the law to the facts under a de novo standard of review. *State v. Williams*, 185 S.W.3d 311, 315 (Tenn. 2006).

An affidavit establishing probable cause is an indispensable prerequisite to the issuance of a search warrant. *See, e.g.*, Tenn. Code Ann. § 40-60-103; Tenn. R. Crim. P. 41(c); *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998); *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). Such probable cause "must appear in the affidavit [itself] and judicial review of the existence of probable cause will not include looking to other evidence provided to or known by the issuing magistrate or possessed by the affiant." *Moon*, 841 S.W.2d at 338; *see also Henning*, 975 S.W.2d at 295. To sufficiently make a showing of probable cause, an affidavit "must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993). However, a decision regarding the existence of probable cause requires that the affidavit contain "more than mere conclusory allegations by the affiant." *State v. Stevens*, 989 S.W.2d 290, 293 (Tenn. 1999); *see also Moon*, 841 S.W.2d at 338.

Furthermore, when "probable cause for a search is based upon information from a confidential informant, there must be a showing in the affidavit of both (1) the informant's basis of knowledge and (2) his or her veracity." *State v. Powell*, 53 S.W.3d 258, 262 (Tenn. Crim. App. 2000); *see also Jacumin*, 778 S.W.2d at 432, 435-36 (utilizing the standard set out in *Spinelli*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969) and *Aguilar*, 378 U.S. 108, 84 S.Ct. 1509, 12 L. Ed. 2d 723 (1964)). To sufficiently make such showings, the affidavit must include facts permitting the magistrate to determine: (1) "whether the informant had a basis for his information that a certain person had been, was, or would be involved in criminal conduct or that evidence of crime would be found at a certain place" and (2) whether the informant is inherently credible or "the reliability of his information on the particular occasion." *Moon*, 841 S.W.2d at 338. Again, the courts have stressed that conclusory statements absent supportive detail will not suffice to establish these requirements. *See, e.g.*, *id.* at 339. However, "independent police corroboration" may compensate for deficiencies. *See Jacumin*, 778 S.W.2d at 436; *Moon*, 841 S.W.2d at 340.

Case law warns against a hyper-technical application of the *Aguilar-Spinelli* test, and this court has previously provided that "[t]he requisite volume or detail of information needed to establish the informant's credibility is not particularly great." *State v. Lowe*, 949 S.W.2d 300, 305 (Tenn. Crim. App. 1996). However, precedent also provides that "the affiant must provide some concrete reason why the magistrate should believe the informant." *Id.*

In his affidavit in support of the search warrant in this case, Detective Zaiden averred as follows:

> Within the past twenty[-]four hours your affiant and members of the Maury County Drug Unit [(MCSDU)] were contacted by a Walgreens pharmacy in Columbia TN via phone. Your affiant was advised that an individual was in their store purchasing a box of pseudoephedrine pills. Your affiant and members of the MCSDU were able to observe this individual exit Walgreens pharmacy and enter into their vehicle and drive to the Kroger pharmacy where individual #2 in this vehicle had entered into the Kroger pharmacy. Members of the MCSDU were able to observe individual #2 purchase a box a pseudoephedrine pills and return to the vehicle where the first individual was waiting. A vehicle stop was conducted with the individuals #1 and #2. These two individuals were cooperative and advised your affiant that these two boxes of pseudoephedrine pills that [sic] were purchased for another person(s), would then take these boxes to another person(s) [sic] with the intent to manufacture methamphetamine. The two cooperating

10

individuals #1 and #2 advised that they were given money and direction on what items to purchase. Individuals #1 and #2 would be receiving a sum of money for these two boxes of pseudoephedrine pills. The cooperating individuals #1 and #2 agreed to make a controlled delivery to the individuals. A controlled delivery of the boxes was made with the other individuals #3 and #4. After the controlled delivery was made a vehicle stop was conducted with these individuals #3 and #4 in Mt. Pleasant, TN. After making contact with individuals #3 and #4, they became cooperative and advised that these boxes of pseudoephedrine pills were going to be delivered to a person that was going to use them in the manufacturing of methamphetamine. Individuals #3 and #4 agreed to make a controlled delivery of these pseudoephedrine pills to the person's known to them as John and [Laurie] Welch. Cooperating individuals #3 and #4 placed a phone call to John and [Laurie] Welch that was unanswered. The cooperating individuals #3 and #4 did send a text message to John and [Laurie] Welch stating that they had a "couple of those things if you want." The cooperating individuals received a phone call from a person known to them as [Laurie] and this conversation was recorded. Your affiant was able to listen to the phone call and heard a female, identified as [Laurie], tell the cooperating individual(s) that it was "ok to come over." The cooperating individuals and their vehicle were searched for illegal narcotics and contraband. None were found. The cooperating individuals were armed with an electronic audio recording device so that the transaction will be recorded as it took place. The members of the MCSDU followed cooperating individual(s) and witnessed the individual(s) enter the residence located at 8982 S Old Hwy 43 Mt. Pleasant TN. A short time later the cooperating individual(s) were observed leaving the residence located at 8982 S Old Hwy 43 and enter into their vehicle and driving away. Your affiant met with the cooperating individual(s) at a predetermined location where the cooperating individual(s) advised that the delivery of the pseudoephedrine pills was made to the individuals known to them as John and [Laurie] Welch. The cooperating individual(s) and their vehicle were searched for illegal narcotics and contraband. None were found. I was able to retrieve the electronic audio recording device the cooperating individual(s) were armed with. The cooperating individual(s) advised that the Persons known to them as John and [Laurie] Welch were going to manufacture methamphetamine. Your affiant believes that based on the above described facts and circumstances that there will be probable cause that evidence in violation

11

of Tennessee drug laws will be found at 8982 Old Hwy 43 Mt. Pleasant TN.

Concerning the affidavit, the trial court held:

> All right, my ruling is this: the motion is denied. Under a common sense reading of the four corners of this document, under the affidavit and support of a search warrant, the Court finds that in the totality of the circumstances set out in the affidavit that there is enough, sufficient probable cause to believe that this warrant should be issued insofar as the Welch's residence.
>
> There's no argument or motion as to the incorrectness of the residence, where the meth would be found or cooked. There maybe three errors insofar as that one name; However, there is John and Jane Doe provision.
>
> The Court finds that *Aquilar* and *Spinelli*, the two prongs are satisfied. The motion is overruled.

We conclude that the observations by the cooperating individuals were corroborated by the detectives prior to the search warrant being applied for pursuant to Detective Zaiden's affidavit. Detective Zaiden observed Cooperating Individuals #1 and #2 (Mr. Castille and Ms. Hicks) purchasing boxes of pseudoephedrine pills from two different pharmacies. After a stop of their vehicle, Cooperating Individuals #1 and #2 advised Detective Zaiden that the two boxes of pills were purchased for another person with the intent to manufacture methamphetamine. The affidavit also indicated that the two individuals said that they were given money and direction on what items to purchase. They also stated they would be receiving a sum of money for the two boxes of pills. Cooperating Individuals #1 and #2 agreed to deliver the two boxes of pills to Cooperating Individuals #3 and #4 (Mr. and Mrs. Glover). After the controlled delivery was made to Cooperating Individuals #3 and #4, their vehicle was stopped by the officers, and those individuals said that the two boxes of pseudoephedrine pills were going to be delivered for the purpose of manufacturing methamphetamine to Defendants, John and "Karen" Welch. We point out that John is Mr. Welch's middle name, and Mrs. Welch's name is erroneously listed as Karen in the affidavit rather than Laurie. Detective Zaiden correctly wrote Mrs. Welch's name as Laurie Lynn Welch at the top of the affidavit.

Detective Zaiden observed a call placed from Cooperating Individuals #3 and #4 to Defendants that went unanswered. He then observed a text that was sent by the cooperating individuals to Defendants stating that the cooperating individuals had a

"couple of those things if you want." Detective Zaiden was present when Cooperating Individuals #3 and #4 received a phone call from "Karen" (Laurie Welch), and the conversation was recorded. Detective Zaiden listened to the phone call and heard Mrs. Welch tell the cooperating individuals that it was "ok to come over." A controlled delivery of the two boxes of pseudoephedrine, that was recorded and monitored by law enforcement officers, took place at Defendants' residence located at 8982 Old Hwy 43 in Mt. Pleasant. The cooperating individual(s) left Defendants' residence and met Detective Zaiden back at a predetermined location. They advised Detective Zaiden that the delivery of the two boxes of pseudoephedrine was made to Defendants, John and "Karen" Welch. They also said that Defendants were going to manufacture methamphetamine. The cooperating individuals' knowledge of the activities at Defendants' residence, as corroborated by Detective Zaiden's observations, satisfy the basis of knowledge prong, as well as the credibility and reliability prong of the *Aguilar–Spinelli* test. We also note that Detective Zaiden included in the affidavit the following concerning production of methamphetamine:

> As a member of the Tennessee Methamphetamine Task Force, I have been trained in the detection and identification of illicit methamphetamine laboratories. As a member of the Maury County Sheriff's Department's Drug Unit, I have actively investigated and successfully prosecuted over one hundred methamphetamine production cases. During said investigations, I have found that person's [sic] who illicitly produce methamphetamine will have in their possession in their residence and/or on their property, other chemicals and apparatus used in the production of methamphetamine. The chemicals used to produce methamphetamine are purchased in larger quantities than is needed to produce methamphetamine at one time. Therefore, the excess chemicals are stored for [a] later date. Many of the apparatus used in the illicit production of methamphetamine will contain residual evidence long after the production of methamphetamine is complete.

Although corroboration of more than a few minor elements of the informant's information is necessary, especially if the elements relate to non-suspect behavior, *State v. Smotherman*, 201 S.W.3d 657, 664 (Tenn. 2006), the events observed by the police need not supply probable cause by themselves or point unequivocally toward guilt. *Moon*, 841 S.W.2d at 341. The observations by police are sufficient if they provide an "'unusual and inviting explanation,'" even though the observations are "'as consistent with innocent as with criminal activity.'" *Id.* (quoting Wayne R. LaFave, *Search and Seizure*, § 3.3(f) at 683 (2d ed. 1987)).

13

We conclude that the affidavit sufficiently establishes probable cause for the search. Defendant is not entitled to relief on this issue.

## II. Warrantless Entry into Defendants' Residence

Next, Defendants argue that the officers' warrantless entry into their residence to secure their persons and freeze the scene while the search warrant was obtained constitutes an independent violation of the right against unreasonable search and seizure.

Both the Fourth Amendment of the United States Constitution and Article I, Section 7 of the Tennessee Constitution prohibit "unreasonable searches and seizures." The purpose and intent of Article I, Section 7 is identical with that of the Fourth Amendment, which is to "safeguard the privacy and security of individuals against the arbitrary invasions of government officials." *Randolph*, 74 S.W.3d at 334 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)); *State v. Gonzalez*, 52 S.W.3d 90, 95 (Tenn. Crim. App. 2000).

A warrantless search is presumed unreasonable under both the federal and state constitutions, and evidence seized from the warrantless search is subject to suppression unless the state demonstrates by a preponderance of the evidence that the search was "conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Simpson*, 968 S.W.2d 776, 780 (Tenn. 1998); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Probable cause and exigent circumstances must exist in order to justify an officer's warrantless entry into a private residence. *Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002). Exigent circumstances may occur in three situations: "(1) when officers are in 'hot pursuit' of a fleeing suspect; (2) when the suspect presents an immediate threat to the arresting officers or the public; or (3) when immediate police action is necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *State v. Steven Lloyd Givens*, No. M2001-00021-CCA-R3-CD, 2001 WL 1517033 at *3 (Tenn. Crim. App. Nov. 29, 2001, at Nashville) (citing *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989), *cert. denied,* 506 U.S. 841, 113 S.Ct. 125, 121 L.Ed.2d 80 (1992)), *perm. app. denied* (Tenn. 2002). The State bears the burden of demonstrating "exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

Various courts have held that exigent circumstances, which would justify a warrantless entry, may not be created by the government's actions. *See, e.g., United States v. Haddix*, 239 F.3d 766, 767-68 (6th Cir. 2001) (noting police officers may not create exigent circumstances to justify warrantless intrusions); *United States v. Richard*,

14

994 F.2d 244, 249 (5th Cir. 1993) (holding that officers improperly created the exigency when they announced their presence as "warrantless entry became a foregone conclusion once officers knocked"); *United States v. Munoz-Guerra*, 788 F.2d 295, 298 (5th Cir. 1986) (concluding warrantless entry was improper where officers created the exigency by knocking on the door and announcing their presence without a reason to believe the suspect had prior knowledge of police surveillance); *Hornblower v. State*, 351 So.2d 716, 718 (Fla. 1977) (concluding "[t]he suspicious movement which occurred when the police announced their presence cannot supply the exigent circumstances to justify the warrantless search"); *Dunnuck v. State*, 367 Md. 198, 786 A.2d 695, 704-05 (Md. 2001) (noting the officers improperly created the exigency by knocking on the defendant's door and alerting him to their investigation); *State v. Williams*, 615 N.E.2d 487, 488-89 (Ind. Ct. App. 1993) (holding that the police officers, who had probable cause to believe drugs were present inside the defendant's residence, improperly created the "emergency" by knocking on the door); *see also State v. Hendrix*, 782 S.W.2d 833, 835 (Tenn. 1989) (recognizing the doctrine relating to officers' creating exigent circumstances but not applying the doctrine in the case as the officers did not make a warrantless entry or search the premises).

In *State v. Meeks*, the Tennessee Supreme Court specifically addressed the exigent circumstances exception in the context of a methamphetamine lab inside a dwelling, a hotel room in that particular case. 262 S.W.3d 710 (Tenn. 2008). Addressing exigent circumstances generally, the Court first stated:

> Exigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant. Thus, in assessing the constitutionality of a warrantless search, the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant. The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry. Mere speculation is inadequate; rather, the State must rely upon specific and articulable facts and the reasonable inferences drawn from them. The circumstances are viewed from an objective perspective; the governmental actor's subjective intent is irrelevant. The manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone. Where the asserted ground of exigency is risk to the safety of the officers or others, the governmental actors must have an objectively reasonable basis for

15

concluding that there is an immediate need to act to protect themselves and others from serious harm.

*Id.* at 723-24 (footnotes omitted). Addressing the circumstances of methamphetamine labs specifically, the Court stated:

> Methamphetamine laboratories are regarded as highly dangerous. In 2000, the United States House of Representatives explained:
>
> > The methamphetamine epidemic in America differs in kind from the threat of other illegal drugs because methamphetamine can be made from readily available and legal chemicals and substances, and because it poses serious dangers to both human life and the environment. Additionally, these chemicals and substances are utilized in a manufacturing process that is unstable, volatile, and highly combustible. Even small amounts of these chemicals, when mixed improperly, can cause explosions and fires. For every one pound of methamphetamine that is produced, approximately five pounds of toxic and often lethal waste products may be left behind at the laboratory site, or disposed of in rivers, kitchen sinks, or sewage systems in an effort to conceal evidence of illegal manufacturing. More disturbing is that most of these laboratories are situated in residences, motels, trailers, and vans, and often times are operated in the presence of children.
>
> In addition to being highly combustible, the vapors or fumes that are generated in the production of methamphetamine pose further dangers. For example, exposure to the toxic fumes or vapors produced during the manufacture of methamphetamine, some of which are carcinogenic, can cause serious inhalation injuries to those at the laboratory site and sometimes even to neighbors.
>
> The hazards posed by an actively operating methamphetamine laboratory are so significant that a number of state and federal courts have determined that the discovery of an actively operating methamphetamine laboratory, in and of itself, creates an exigent circumstance justifying immediate action without the attendant delays that accompany obtaining a search warrant. Other courts that have recognized the dangers of actively operating methamphetamine laboratories have stopped short of adopting a per se rule. Rather, they have based their finding of exigency on the location of the particular laboratory. These courts have focused

16

on whether there were people in the vicinity of the actively operating methamphetamine laboratory, notably neighbors, law enforcement officials, and those manufacturing the methamphetamine. Regardless of the approach taken, whether a per se rule or a determination based upon the presence of others in the vicinity, the scope of a permissible warrantless search remains limited to the scope of the exigency.

*Id.* at 724 (citations omitted).

In *Meeks*, the court held that the distinctly strong odor of methamphetamine emanating from the hotel room indicated to the officers that an active methamphetamine lab was inside the room, putting the occupants and those in the immediate vicinity in serious danger. *Id.* at 726-27. The Court held that the conclusion that an active methamphetamine lab was inside the hotel room "provided the officers with an objectively reasonable basis for concluding that there was an immediate need to act to protect themselves and others from serious harm." *Id.* at 727. As such, the warrantless search of the hotel room was justified under the exigent circumstances exception to the Fourth Amendment. *Id.; see also State v. Joseph Meadows*, No. M2015-00211-CCA-R3-CD, 2016 WL 106599, at *6-8 (Tenn. Crim. App. Jan. 11, 2016) *perm. app. denied* (Tenn. Mar. 22, 2016).

We note that Detective Zaiden testified that upon entering the residence, the officers escorted Defendants to the front porch and detained them while Deputy Zaiden obtained a search warrant. Generally, a suspect may be temporarily detained outside his or her residence and prevented from entering the residence unaccompanied by a police officer for a reasonable time while the police obtain a search warrant. *See Illinois v. McArthur*, 531 U.S. 326, 331-33, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). However, we conclude that the trial court in this case erred by determining that the officers had justification to enter Defendants' residence without a search warrant pursuant to the exigent circumstances exception. The officers in this case were aware that two boxes of pseudoephedrine had been delivered to Defendants' residence by Mr. Glover and that the pills would be used to manufacture methamphetamine. However, unlike the officers in *Meeks*, there was no indication that methamphetamine was being manufactured in the residence at that time when the officers entered before the search warrant was obtained. It was not until officers entered that they saw a "cook bottle" and could smell an odor of methamphetamine. Therefore, the warrantless entry into Defendants' house was unlawful.

We also reject the officers' suggested "exigent circumstance" that if they did not immediately enter the house where the pseudoephedrine had been delivered, the officers themselves would be committing a crime. Specifically, Detective Wagonschutz testified,

17

[A] secured operation is when we do a controlled delivery of pseudoephedrine. We take certain steps to make sure that it is going to be used for an illicit purpose.

When we secure the residence, in order to keep from violating the law, ourselves, when we deliver a box of pseudoephedrine we can't allow that person to turn Sudafed into meth, because then we will have aided in that crime.

This logic is nothing more than officers creating "exigent circumstances" in order to enter a home without a warrant. If this reasoning by the officers was valid, then they would have twice committed the crime of promotion of methamphetamine manufacture by allowing *first* "individuals #1 and #2" to deliver the pseudoephedrine to "individuals #3 and #4" and *second*, allowing Mr. Glover to deliver the pseudoephedrine to Mr. and Mrs. Welch. Such result is not the law, just as an undercover officer does not commit a crime when in the performance of duties, he/she purchases methamphetamine from an individual.

The State contends that even if the initial warrantless entry and detention were unlawful, the challenged evidence was not the fruit of the unlawful entry or detention; instead, the evidence was properly seized as a result of a valid search warrant. We agree.

The exclusionary rule may bar the admissibility of evidence which was obtained either directly or derivatively from an unconstitutional search or seizure. *See Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, the exclusionary rule does not apply to evidence obtained by means independent of the constitutional violation. *Id.* at 487. Rather, the underlying policy of the "independent source doctrine" is that "'while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied.'" *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992) (quoting *Murray v. United States*, 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)).

Pursuant to the independent source doctrine, "an unconstitutional entry does not compel exclusion of evidence found within a home if that evidence is subsequently discovered after execution of a valid warrant obtained on the basis of facts known entirely independent and separate from those discovered as a result of the illegal entry." *Clark*, 844 S.W.2d at 600. In order for evidence discovered during the execution of the subsequent search warrant to be found independent of the prior unconstitutional entry, information obtained during the unlawful entry must not have been presented to the issuing magistrate. *Clark*, 844 S.W.2d at 600.

18

The probable cause for the search warrant in this case was developed independently of any information gained from the warrantless entry. Accordingly, we conclude that the trial court properly denied Defendants' motion to suppress because any evidence obtained was as the result of a valid search warrant. Defendants are not entitled to relief on this issue.

## III.     Sufficiency of the Evidence

Both Defendants contend that the evidence was insufficient to support their convictions for the promotion of methamphetamine manufacturing and the initiation of methamphetamine manufacturing. Defendant John Welch also challenges his conviction for possession of drug paraphernalia. However, we find that the evidence was sufficient beyond a reasonable doubt to support the convictions.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Tennessee Code Annotated section 39-17-433 provides:

> (a) It is an offense for a person to promote methamphetamine manufacture. A person promotes methamphetamine manufacture who:
> (1) Sells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use.

19

(2) Purchases or possesses more than nine (9) grams of an immediate methamphetamine precursor with the intent to manufacture methamphetamine or deliver the precursor to another person whom they know intends to manufacture methamphetamine, or with reckless disregard of the person's intent; or

(3) Permits a person to use any structure or real property that the defendant owns or has control of, knowing the person intends to use the structure to manufacture methamphetamine, or with reckless disregard of the person's intent.

Tennessee Code Annotated section 39-17-435(a) provides: "It is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." Initiate is defined as "begin[ning] the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." T.C.A. § 39-17-435(c). Tennessee Code Annotated section 39-17-425(a)(1) provides:

[I]t is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or controlled substance analogue in violation of this part.

Methamphetamine is a Schedule II controlled substance. T.C.A. § 39-17-408(d)(2).

Detective Zaiden, who was certified as a methamphetamine expert, testified that pseudoephedrine is a precursor to methamphetamine. Mr. Castille and Ms. Hicks both told Detective Zaiden that the two boxes of pseudoephedrine that they purchased would be sold to Mr. Glover and that it would be used to manufacture methamphetamine. When Mr. Glover was pulled over after obtaining the two boxes of pseudoephedrine from Mr. Castille and Ms. Hicks during the controlled delivery, he agreed to make a controlled delivery of the two boxes of pseudoephedrine to Defendants. Mr. Glover spoke with Laurie Welch by phone and told her, "Well, I have those two things for you." Mrs. Welch replied: "Yeah, come on. Come on over." The "two things" referred to the two boxes of pseudoephedrine. Mr. Glover testified that even before he was stopped by police, he had planned to give the pseudoephedrine to Defendants to make methamphetamine. Mr. Glover drove to Defendants' house at approximately 11:00 p.m. to deliver the two boxes of pills. Mr. Glover testified that he took the two boxes of pseudoephedrine inside the residence and placed them on a table in the living room in

front of both Defendants. Mr. Welch then offered to reimburse Mr. Glover for the pills. Mr. Glover understood that payment for the pseudoephedrine pills would be in the form of a finished methamphetamine product. This proof established each Defendant's guilt of the offense of promotion of methamphetamine manufacture beyond a reasonable doubt.

The residence was searched pursuant to a search warrant. An active methamphetamine "lab" was found in the house that consisted of a "cook bottle," which Detective Zaiden described as the "actual apparatus that is used to manufacture meth in the process of manufacturing meth." He further explained that all of the ingredients used to manufacture methamphetamine are placed inside the bottle and mixed together. It is also known as the "shake and bake" method. The bottle contained a clear liquid that was tested and determined to contain methamphetamine which would later become "usable" methamphetamine during the "gassing-off" process. The officers testified that the odor of the active methamphetamine was a strong and distinct smell.

During the search of the residence, officers also discovered an ammunition can which contained the following items: seven packages of plastic tubing; two packages of coffee filters; one black meth pipe; one opened instant cold pack; a one-gallon bottle of muriatic acid; a one-gallon can of lantern fuel; one gas generator bottle; two one-pound bottles of lye; one small funnel; one measuring cup; one small tin can with eleven lithium batteries; five used coffee filters; and four bottle caps. Detective Zaiden explained that all of the items are commonly used in the manufacture of methamphetamine. This evidence establishes each Defendant's guilt of the offense of initiating a process intended to result in the manufacture of methamphetamine beyond a reasonable doubt.

In addition to the items in the ammunition can, officers also found additional plastic tubing, a razor blade with residue that field-tested positive for methamphetamine, eight aluminum "boats," a case with a glass pipe, a small black electronic scale commonly used to measure methamphetamine to sell, two metal grinders with marijuana residue, a white pill bottle with burnt marijuana cigarettes, a hemostat with a burnt marijuana cigarette, a glass marijuana pipe, a package of rolling papers, a white electric blender commonly used to grind pseudoephedrine pills, a package of AA lithium batteries, and pipe cutters. Detective Zaiden testified that pipe cutters are commonly used to open lithium batteries.

Mr. Welch contends that there was no evidence presented to show that he was in "actual possession of any drug paraphernalia, specifically, aluminum "boats." Mr. Welch further argues that the "paraphernalia was found on a table inside the residence" and that there "had been at least two other individuals in the house who could have been in possession of the paraphernalia[.]"

21

Possession may be actual or constructive. *See State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). If possession is deemed to be constructive, there must be proof that the accused had "'the power and intention at a given time to exercise dominion and control over ... [the drugs] either directly or through others.'" *Shaw*, 37 S.W.3d at 903 (quoting *State v. Patterson*, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)). The mere presence of an individual in an area where drugs are found is not sufficient, standing alone, to find constructive possession. *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). Similarly, an individual's mere association with a person in control of the drugs or the property where the drugs are located is not enough to support a finding of knowing possession. *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987).

Constructive possession depends on the totality of the circumstances in each case. It may be proven by circumstantial evidence. Tenn. Code Ann. § 39-17-419 (2006) (stating that possession may be inferred from "relevant facts surrounding the arrest"). Circumstantial evidence is sufficient to sustain a defendant's conviction even if the evidence does not "remove every reasonable hypothesis except that of guilt." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011) (quoting *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)). The evidence presented, however, must be sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. *Cooper*, 736 S.W.2d at 129.

*State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013).

In this case, the circumstantial evidence was sufficient to show that Mr. Welch had constructive possession of the drug paraphernalia found in his home. Mr. Glover testified that Mr. Welch offered to "pay" him for the boxes of pseudoephedrine with methamphetamine. When Detective Zaiden asked Mr. Welch about all of the items found in the house, Mr. Welch said, "It is what it is." A reasonable juror could conclude that Mr. Welch made an implicit admission that the items were drug paraphernalia used to manufacture or ingest the controlled substance, methamphetamine.

Based upon the evidence presented, a rational jury could find each Defendant guilty of promotion of methamphetamine manufacturing and the initiation of methamphetamine manufacturing. A rational jury could also find Defendant John Welch guilty of possession of drug paraphernalia. Defendants are not entitled to relief as to this issue.

## IV.    Sentencing

Defendant John Welch contends that his effective eighteen-year sentence is "excessive and inconsistent with the purposes and principles of sentencing." He further contends that "[n]o enhancement factors were filed by the State; however, the trial court considered Appellant's criminal history as an enhancement factor."

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning were improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. T.C.A. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts.

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement and mitigating factors are *advisory only*. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and

23

enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select *any sentence within the applicable range* so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act]." *Id*. at 343 (emphasis added). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*. at 346.

In *Bise*, our supreme court held:

> We hold, therefore, that a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court *wholly departed* from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

*Bise*, 380 S.W.3d at 706 (emphasis added). In its conclusion, the supreme court pointed out that in sentences involving misapplication of enhancement factors (even in those cases where no enhancement factor actually applies) the sentences must still be affirmed if the sentences imposed are within the appropriate range, and the sentences are in compliance with statutory sentencing purposes and principles. *Id*. at 710.

Our General Assembly has enacted twenty-five (25) statutory sentencing enhancement factors; however, they are not binding upon the trial courts. T.C.A. § 40-35-114 (Supp. 2015). As previously noted, the weighing of mitigating and enhancement factors is left to the trial court's discretion, *Carter*, 254 S.W.3d at 345, and in fact the trial court's weighing of enhancement or mitigating factors is not a ground for appellate relief. *Id*.; T.C.A. § 40-35-401(b). The standard of review established in *Bise* provides that the minimum sentence can be imposed even if the trial court correctly applies all twenty-five enhancement factors, or conversely the maximum sentence can be imposed even if no statutory enhancement factors are applicable, so long as the sentence is within the correct range and the sentence complies with the sentencing purposes and principles.

The applicable sentencing range for a Range II Multiple Offender convicted of a Class B felony is 12 to 20 years, and the range for a Class D felony is 4 to 8 years. T.C.A. §§ 39-17-4385(f); 39-13-210(c); 40-35-112(b)(2). The trial court explained in detail the factors that it considered in sentencing Defendant. The court found as an enhancement factor that Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. T.C.A. § 40-35-114(1). Concerning this issue, the trial court said:

24

The prior criminal history of Mr. Welch is significant, in this Court's eyes, from age 17 to 34. Mr. Welch has a total of six prior felony convictions before our offense; including Attempted Voluntary Manslaughter, Armed Robbery, the old charge of Larceny, Attempted Burglary, Escape, and Voluntary Manslaughter. Most of those, in this Court's eyes, involve violent felonies.

He also has six prior misdemeanor convictions. Three are traffic, a D.U.I., marijuana, and a weapon conviction.

He also, according to the record, is a multi-county offender; Maury, Lawrence, and Davidson.

The record supports the application of this factor, and Defendant does not challenge its application. The trial court did not find any mitigating factors that applied to Mr. Welch.

Mr. Welch also seems to imply that since State did not file any enhancement factors for the sentencing hearing, the trial court could not consider his criminal history as an enhancement factor. However, the application of enhancement and mitigating factors is left to the trial court's discretion. *Carter*, 254 S.W.3d at 345. Therefore, the lack of enhancement factors filed by the State prior to sentencing would not preclude the trial court from considering Defendant's prior criminal history as an enhancement factor. We note that prior to trial, the State filed a notice to seek enhanced punishment as a Range II offender as required by T.C.A. § 40-35-202(a). Also, there is no statutory requirement that the State file notice of proposed enhancing factors for sentencing in the appropriate range.

The trial court in this case clearly stated that it had considered all of the relevant sentencing information, and we have no reason to doubt the trial court's statement. *State v. Darrel Dean Hochhalter*, No. M2014-01106-CCA-R3-CD, 2015 WL 4556917, at *17 (Tenn. Crim. App. July 29, 2015). Because the trial court properly considered the evidence offered by the parties, stated on the record what enhancement and mitigating factors were considered, and complied with the purposes and principles of sentencing and imposed a within range sentence, the trial court did not abuse its discretion in enhancing Defendant's sentence and sentencing him to eight years for the promotion of methamphetamine manufacturing and eighteen years for the initiation of methamphetamine manufacturing. Defendant is not entitled to relief.

Accordingly, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE